2017 PA Super 321

COMMONWEALTH OF PENNSYLVANIA,

    Appellee

             v.

JOHN JAMES SUCCI,

    Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 480 EDA 2015

Appeal from the Judgment of Sentence January 16, 2015
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0002732-2014

BEFORE:  PANELLA, SHOGAN, and PLATT,[*] JJ.

OPINION BY SHOGAN, J.:                    **FILED OCTOBER 12, 2017**

John Succi, ("Appellant") appeals from the judgment of sentence entered January 16, 2015, following his conviction by a jury on December 12, 2014, of two counts of home improvement fraud, twelve counts of deceptive or fraudulent business practices, twelve counts of theft by deception and one count of insurance fraud.[1]  We affirm.

The trial court set forth the following factual history:

> The testimony elicited over the lengthy trial established that [Appellant] owned and operated a construction company located in Yardley, Bucks County. Deborah Parker resided in a single family home located in Doylestown, Bucks County.  In June of 2005, Mrs. Parker entered into a home improvement contract with [Appellant].  Pursuant to that contract and an addendum to the contract, [Appellant] agreed to make a number

---

[*]  Retired Senior Judge assigned to the Superior Court.

[1]  73 P.S. § 517.8(a)(2), 18 Pa.C.S. § 4107(a)(2), 18 Pa.C.S. § 3922(a)(1), and 18 Pa.C.S. § 4117(b)(4), respectively.

of internal and external improvements to Mrs. Parker's home. The project was to be completed in four weeks. Three months after construction began, the project had still not been completed. Due to [Appellant's] poor work, his routine absences from the project and his repeated demands for money in advance, Mrs. Parker contacted other contractors who, after inspecting the property, advised her that the work [Appellant] had done was so inferior, it would have to be completely redone. [Appellant] ultimately abandoned the project leaving asbestos and other debris littered around the property. When he stopped work, major portions of the work were incomplete and the work that had been completed was substandard. After abandoning the project, [Appellant] placed a mechanic's lien on Mrs. Parker's property. At the time of trial in December of 2014, much of the original project had still not been completed and the remaining defective work had still not been repaired.

In August of 2005, about the same time [Appellant] abandoned Mrs. Parker's project, [Appellant] contracted with Richard Schulang to perform construction work on Mr. Schulang's home in Jamison, Bucks County. Under the terms of the contract, [Appellant] agreed to finish the basement of the home which was to include framing, insulation, electric, installation of a drop ceiling, construction of a cover for a radon pipe with an access panel and construction of a mechanical closet for $28,500. He also agreed to enlarge an existing deck on the home and replace the old decking with composite wood for $6,500. This project was supposed to be completed within three weeks.

By February of 2006, after numerous delays in construction, [Appellant] stopped work. At the time he abandoned the project, much of the work had not been completed although he had received all but $1,250 of the contract price. In addition, much of the work that had been completed was substandard. The deck [Appellant] built could not pass inspection and was torn down. The composite wood decking used was improperly installed, voiding its warranty. In the basement, the electrical work did not pass inspection. Many of the outlet holes were too large and needed to be fixed. In addition, various materials Mr. Schulang had paid for were not delivered, including ground fault interrupters, door handles, deck railings and tile. A permit Mr. Schulang had paid for was never

obtained. In May of 2006, [Appellant] placed a mechanic's lien on Mr. Schulang's property.

In August of 2006, a few months after [Appellant] stopped working on the Schulang project, [Appellant] contracted with Brian Hahn to add a basement to Mr. Hahn's home in Lower Makefield Township, Bucks County. Construction of the basement entailed removal of the back deck, lifting the structure, excavating the basement, laying a new foundation and lowering the structure onto the new foundation. [Appellant] agreed to perform the work for $45,000.

Although Mr. Hahn had paid [Appellant] a total of $52,600, an amount in excess of the original contract, [Appellant's] work was seriously deficient. [Appellant] initially failed to obtain the necessary permits and work was sporadic. The work site was scattered with debris. The foundation was inadequate and in danger of collapse. Because the house was not set on the foundation properly, the windows in the home would not open, tiles popped, walls cracked, kitchen cabinets pulled away from the walls and the floor sloped.

During a discussion of [Appellant's] demand for more money and his failure to obtain the necessary inspections, Mr. Hahn asked if he needed to "protect" himself. [Appellant] responded, "If you go legal on me, I'll bury you. I'll bury you financially." Mr. Hahn thereafter contacted an attorney and removed [Appellant] from the project. Eventually, Mr. Hahn was forced to expend over $160,000 to obtain the necessary permits and inspections and to bring the project into conformity with the original architectural plans and engineering specifications.

On April 3, 2007, [Appellant] entered into an agreement with Monica Cienuch and her husband, Adam, to rebuild the kitchen in their home in Levittown, Bucks County. The agreement called for [Appellant] to remove the existing sunroom, lay a foundation, erect the framing for the kitchen and install basic electric and plumbing.[2] In May of 2007, [Appellant] and the [Cienuches] agreed that [Appellant] would

---

2 We note that the Cienuches' last name is spelled variously as Cienuch in the trial court opinion and as Cienuich in the notes of testimony. For the sake of clarity we shall use the trial court's spelling, Cienuch.

also finish the interior of the kitchen. The entire project was to cost $36,000.

On May 16, 2007, [Appellant] notified Mrs. Cienuch that the construction permits had been approved. On May 21, 2007, demolition began. On May 24, 2007, Mrs. Cienuch was advised that, although an application had been made, the permits had not yet been obtained. Mrs. Cienuch took matters in her own hands and was able to obtain the necessary permits on June 1, 2007.

Thereafter work proceeded sporadically and the [Cienuches] soon began to observe problems. With regard to the foundation, [Appellant] failed to deliver the foundation material that had been agreed upon, using demolition debris instead of high-quality stone. The foundation laid by [Appellant] did not pass inspection. There were also significant problems with the framing. Although they had notified [Appellant] of the defective framing and [Appellant] had assured them problems with the framing would be corrected, the issues with regard to the framing remained unaddressed. Despite having received $30,500 of the total contract price of $36,000, [Appellant] had only completed the foundation, framing and basic plumbing. The cabinets and countertops that Mr. and Mrs. Cienuch had paid $7,000 in advance to [Appellant] were never ordered or delivered.

As a result of the issues regarding delays, materials and inferior workmanship, the [Cienuches] retained an attorney, terminated the contract and demanded a refund of $20,000. In response, [Appellant] stated that the [Cienuches] were "welcome to go to court," adding that he was going to "lock [them] in the litigation for years." The [Cienuches] thereafter retained a new contractor to repair and complete the project. The additional cost for labor alone was $24,800.

In September of 2007, [Appellant] entered into an agreement with Anthony Succi and his parents to build a special needs home for Mr. Succi's son on the parents' property in Philadelphia for $210,000. During the project, the price increased based on [Appellant's] representations that additional money was needed to address unexpected problems. Mr. Succi paid [Appellant] over $263,900. The project was thereafter shut

down by the Philadelphia Department of Licenses and Inspection for non-compliance and lack of permits.

Mr. Succi described the status of the project at the time [Appellant] was shut down as "a shell." He further stated,

> [Appellant] had constructed a foundation of concrete that was out of level. It had a 7-foot basement that leaked at least a foot of water at a minimum. It had a roof that was put on that leaked profusely. It had windows partially put in. And the whole outside was just pure plywood that started rotting because of the weather and inside had two by four's.

The Philadelphia Department of Licenses and Inspections required Mr. Succi to demolish the house for health and safety reasons. Demolition cost Mr. Succi an additional $15,000.

On June 4, 2008, [Appellant] contracted with Stuart Abramson to build an addition to Mr. Abramson's residence in Buckingham Township, Bucks County. [Appellant] agreed to add a room, enlarge the garage and another area of the house, construct a patio and install stucco. The total cost of the project was $142,000. [Appellant] also agreed to a specific payment schedule that was tied to the completion of specific items of work. However, after construction commenced, [Appellant] frequently requested money ahead of the payment schedule, claiming that, without the money, he could not order materials. By January of 2009, Mr. Abramson had paid [Appellant] $120,000. Mr. Abramson had paid for but did not receive drywall, electric, the shingle roof, windows, stucco, heating and air conditioning, a fireplace, hardwood flooring and tile work.

In January of 2009, the Township inspected the project and issued a stop work order. Much of the work [Appellant] had done needed to be removed due to code violations. Mr. Abramson explained the resultant condition of the addition as follows:

> Now I was left with a bare frame. There was nothing inside. No drywall, minimal insulation, concrete floors that were poured incorrectly. They made me bring in a carpenter and take down support

- 5 -

structures from all the ceilings, because they weren't to code.

Mr. Abramson paid other contractors $70,000 to complete the projects. [Appellant] did not reimburse Mr. Abramson for any of the work not performed or materials not delivered.

In September of 2008, while Mr. Abramson's project was still underway, [Appellant] entered into a preliminary contract with Andrew Spicer to build an addition to his home in Pipersville, Bucks County. Once architectural plans were completed, a final contract was executed in October of 2008. Under the terms of the final contract, the total cost of the project was $97,000. Work was to be completed in about six months. Pursuant to the final contract, Mr. Spicer paid [Appellant] $21,550 in deposits for materials and [Appellant] began construction. By Thanksgiving, [Appellant] had dug a hole for a foundation. By the end of November, early December of 2008, work on the foundation had begun but had not been completed. Thereafter, all work stopped until March of 2009.

In a separate agreement, entered into at the end of 2008 or the beginning of 2009, [Appellant] agreed to tile the kitchen floor that was adjacent to the planned addition for a price of $4,500 or $5,000. [Appellant] was paid and work commenced.

In March of 2009, [Appellant] resumed work on the addition. At that time the foundation was poured and framing was completed. At this stage of the project, [Appellant] began to demand payments ahead of the payment schedule. While Mr. Spicer made at least one payment ahead of schedule, he began to refuse to pay for work until that work was in fact completed in accordance with the contract.

In May of 2009, the project was terminated by agreement. By that time, Mr. Spicer had paid [Appellant] $67,000 for work that was incomplete, defective or not in built with the specified material. Specifically, the architectural plans called for large wooden beams, called "LVL" beams, to be used in the framing. Although those beams were initially installed by [Appellant], he later replaced them with scrap wood. Numerous tiles installed by [Appellant] in the kitchen of Mr. Spicer's home thereafter "popped" while others cracked. Pieces of the old porcelain tile floor were dumped in the backyard. [Appellant's] substandard

- 6 -

work caused the ceiling of Mr. Spicer's home to crack and the porches to sink. The Spicers were unable to correct all of the problems without demolishing the work and starting over. The Spicers spent approximately $85,000 to finish the project "as best [they] could."

In September of 2009, [Appellant] agreed to build an addition onto the home of Jeffery and Anette Goldstein in Richboro, Bucks County, for the use of Mrs. Goldstein's mother, Erica Baratz, for $80,000. [Appellant] agreed to demolish an existing garage and bathroom and to construct a complete residential structure with a brick patio.

During construction, [Appellant] left a wall to the home open to the outside, with only a tarp covering certain areas. Other problems also arose. The project failed multiple inspections, damage was caused to original property and [Appellant] began to significantly deviate from the construction plans. Although work initially began in a timely manner, the project soon became months behind schedule and [Appellant] began to continuously demand[] money from Mrs. Baratz. When Mrs. Baratz exhausted her funds, [Appellant] told her to charge the work to her credit cards. Ultimately, [Appellant] received approximately $120,000 from the Goldsteins and Mrs. Baratz. When Mr. Goldstein voiced complaints, [Appellant] warned him that he had "political power" and threatened to make Mr. Goldstein's life "miserable."

In July or August of 2010, [Appellant] walked off the job. At that time, [Appellant] had completed only eighty percent of the work outlined in the contract and had failed to order or deliver items that had been paid for in advance, including $5,000 worth of cabinets and two fireplaces. [Appellant] did not finish constructing the walls, used regular concrete instead of brick on the patio and had installed inferior air conditioning and heating units. The Goldsteins and Mrs. Baratz were financially unable to complete the project. They received estimates that the heating and air conditioning alone would cost $15,000 to $20,000, an amount they could not afford. They did expend an additional $5,000 to complete the necessary electrical and plumbing work and for a fireplace.

In January of 2010, [Appellant] agreed to build a home in Margate, New Jersey for Larry Feinman, a resident of Holland,

- 7 -

Bucks County. Initially, due to their personal relationship, [Appellant] and Mr. Feinman proceeded without a formal contract. Mr. Feinman gave [Appellant] blueprints for construction of a three-story home and [Appellant] agreed to build the home for $425,000. The price was later raised to $470,000. After the project ran behind schedule, Mr. Feinman insisted [on] executing a formal agreement. That agreement was entered into in June or July of 2010 and set forth an agreed price of $470,000.

By the end of 2010, Mr. Feinman had paid [Appellant] more than the contract price. Despite that fact, [Appellant], who had "been off the job for a while," appeared to have abandoned the project, leaving a substantial amount of the project incomplete. [Appellant] never built permanent stairways to the upper floors and had not installed any of the plumbing fixtures. [Appellant] never delivered materials and appliances Mr. Feinman had paid for, including air conditioner compressors, kitchen appliances, kitchen cabinets, tile, insulation and drywall. The total cost of these items was at least $19,000. Although [Appellant] did install a water heater, he did not install a "tankless" water heater system as specified in the contract. As a result of all of these deficiencies, Mr. Feinman was forced to expend more than $300,000 to complete the home.

On May 20, 2010 after a few months of negotiation, [Appellant] contracted with Dr. Sherri Landes, a resident of Ivyland, Bucks County, to build a home on her property in Margate, New Jersey. [Appellant] agreed to construct the home in accordance with the architectural plans for $395,300. Although Dr. Landes initially intended to finance the construction with a construction loan, [Appellant] persuaded her to borrow on her existing home equity line of credit. A construction loan would have required bank inspections to determine that the work had been properly completed before funds were released to pay for that work. Initially, Dr. Landes followed the practice that would have been in place if she had obtained a construction loan, *i.e.* inspection of the work to determine if the work had been properly completed before funds were released to pay for that work. However, [Appellant] eventually began to ask for money in advance of the payment schedule for materials. Dr. Landes obtained a second home equity line of credit for $500,000 to keep the project moving.

Dr. Landes paid [Appellant] in advance for many of the materials to be used in the project, *i.e.,* $30,000 for windows, $5,500 for plumbing fixtures, $15,000 for tile, $1,400 for granite countertops, $6,500 for railings and $19,375 for external concrete pillars. [Appellant] never purchased these items. Dr. Landes ultimately had to purchase these items directly from the suppliers to complete the project. Dr. Landes paid [Appellant] and his suppliers a total of $604,465.17 on a home she had contracted to have built for $395,300.

In March of 2011, [Appellant] asked for an additional $55,500 to complete the job. At the end of March, Dr. Landes asked [Appellant] to provide an accounting of project expenditures. [Appellant] provided her with a list of expenditures that included payments for [Appellant]'s personal expenses, payments to suppliers that had not been made, payments for labor and materials for work that had not been done, and other unauthorized expenditures. Many line items were left blank. No receipts were provided.

Work ceased in April of 2011. Dr. Landes described the condition of the property at that time as follows:

> It contained a tile roof with no underlayment, meaning no flashing, nothing to prevent it from leaking. The tiles that were on there were not the tiles that he showed me initially. They ended up to be Northern roof tiles which I paid for, again, as I mentioned. And they all had to be removed. And I had to pay an extra [$] 25,000 for the roof to be fixed so that it wouldn't leak. There was a thin coat of stucco on the outside that was placed before the windows were put in. I questioned that but, you know, [Appellant] said, "You are not a builder. You don't know anything." But I had built a house before and I knew stucco shouldn't be placed before windows. So that had to be removed. It was a thin coat that would have leaked. And there were no flashings. So ultimately I had to pay another – I have the figures. I think it was another 17,500 or maybe even more for stucco to properly be constructed.

Q. Had you already paid [Appellant] for that stucco?

A. Yes. I paid for everything on the contract. And so in addition to the roof and the framing, there was nothing inside of the house. There were no walls, there was no plumbing, there was no interior, nothing. The only thing that was, there was a decorative marble fireplace surround that I had purchased. [Appellant] called me one day and said, "We are ready for your fireplace surround," so I thought that walls were up. I thought the drywall was up and interior was finished. And when I drive down from Pennsylvania to New Jersey to actually see the house, I saw the fireplace surround, but no walls. And when the house was finally built, it had to be retrofitted because it was just a decorative thing put up with no walls. There was really nothing else there. There were balconies and they had to be resurfaced and redone because they weren't constructed properly. And nothing else that I had paid for was present.

\* \* \*

The exterior concrete finishes were not done which included a driveway, sidewalk and that kind of thing. HVAC installations, not done; electrical work, not done; plumbing installations, not done; drywall interior finishes, not done; all interior and exterior trim finished, decks and rails only half done. Because I did have decking, but I had no windows and I had no interior, obviously. So this includes interior trim, doors, windows, railings, base board column, hardwood flooring, not done; marble tile flooring in bathrooms not done; marble tile, all the interior work, nothing done; all walls and ceilings painted, not done; kitchen fixtures, not done.

Dr. Landes paid an additional $400,000 to finish building the house, spending in total, one million dollars to build a $400,000 home. [Appellant] never reimbursed Dr. Landes for work not performed or for materials not delivered. Instead, he filed a mechanic's lien against her property for $150,000. When a potential customer, Phil Karali, called Dr. Landes to inquire about [Appellant's] job performance, she told him that she paid [Appellant] $604,000 for a home and got a shell, a roof and a framed structure. [Appellant] sued her for defamation of character and tortious interference with a contract.

In November of 2011, [Appellant] contracted with Cindy and Dale Ross to remodel the first floor of their residence in Levittown, Bucks County. [Appellant] agreed to completely gut the first floor, rebuild the bathroom and kitchen and install drywall and new heater for $94,500. [Appellant] told the Rosses that they would have to move out of their residence by January 9, 2012 but that they would be able to return on March 8, 2012. In May of that year, a cease work order was issued by the local authorities due to the fact that [Appellant] had not obtained the proper permits. When the project was shut down, the Rosses terminated their contract.

Although the Rosses had paid [Appellant] $86,583 of the $94,500 contract price, [Appellant] had completed only 25 to 35 percent of the work specified in the agreement. Mrs. Ross testified that she was left with "a gutted empty house, no walls, no plumbing, no electric." The Rosses never receive[d] all of the materials they had paid for in advance, including granite counter tops and insulation. [Appellant] never reimbursed Mrs. Ross for work not finished or materials not delivered. He told Mrs. Ross that he would complete the project if she paid him an additional $35,000. In order to enjoy the use of their home, the Rosses were forced to pay another contractor $200,000 to correct and complete the renovation.

In October of 2013, [Appellant] contracted with George Monti to rebuild a roof on a commercial property located in Tullytown, Bucks County for $28,875. This contract was later increased by $6,575 at [Appellant's] suggestion to add plywood to the "decking." After Mr. Monti agreed to the addendum, [Appellant] began to regularly request more money in advance for materials. The project, which [Appellant] represented could be completed in a few days, was still not completed as of April of the following year. In the interim, extensive water damage was caused to the interior of the building by "leaks" in the incomplete roof. Mr. Monti hired another roofer to complete the project for $50,000. In addition, Mr. Monti suffered a substantial financial loss due to the damage to his real and personal property caused by water damage.

In August of 2013, shortly before [Appellant] contracted with Mr. Monti to rebuild his roof, [Appellant] obtained a commercial insurance policy from Erie Insurance. Timothy Pantano, a salesman and customer service

representative for Erie Insurance, sold the policy to [Appellant]. During the application process, [Appellant] made several misrepresentations. He told Mr. Pantano that he had not filed for bankruptcy in the past five years, that he did not subcontract any work and that he did not accept jobs that only involved new roofing or reroofing. [Appellant] later signed the application, certifying that the information he had given was true and complete.

Trial Court Opinion, 5/22/17, at 2–16 (citations omitted).

Following the trial, the jury found Appellant guilty of two counts of home improvement fraud, twelve counts of deceptive or fraudulent business practices, twelve counts of theft by deception and one count of insurance fraud and the trial court sentenced him to fourteen to twenty-eight years of imprisonment. Appellant eventually was found to be an eligible offender for purposes of the Recidivism Risk Reduction Incentive Act ("RRRI") and his aggregate RRRI minimum sentence was reduced to eleven and a half years.

Appellant filed his notice of appeal on February 17, 2015, and following a convoluted appeals process,[3] the case is now before this Court.

Appellant raises the following issues for our review:

I. Were fourteen of [Appellant's] convictions barred by the statute of limitations because those counts were discrete offenses, separate and apart from the timely charged offenses?

II. Did the Court of Common Pleas of Bucks County lack jurisdiction over crimes committed in Philadelphia County and/or the State of New Jersey?

_____

[3] The trial court's supplemental opinion sets forth the events and filings that ultimately resulted in Appellant's current appeal. Trial Court Opinion, 5/22/17, at 1–2.

- 12 -

III. Was the Court of Common Pleas of Bucks County not a proper venue for crimes committed in Philadelphia County and /or the State of New Jersey?

IV. Did the trial court impose an illegal and unconstitutional sentence when the court sentenced [Appellant] with the intent to impose a life sentence?

V. Did the trial court err when the court concluded [Appellant] waived his appellate rights because he did not obtain trial transcripts for the court's review?[4]

Appellant's Brief at 5.

Turning to Appellant's first issue, he argues that fourteen of his convictions, *i.e.*, the counts involving Mrs. Parker, Mr. Shulang, the Hahns, the Cienuches, Mr. Succi, Mr. Abramson and Mr. Spicer, are barred by the statute of limitations. *Id*. at 11–21. Appellant asserts that the trial court erred when it found his crimes constituted a continuing course of conduct for purposes of the running of the statute of limitations. *Id*. at 13. He further argues that the legislature did not intend to treat theft by deception and deceptive business practices as continuing offenses for purposes of tolling the five-year statute of limitations. *Id*. at 16.

"A question regarding the application of the statute of limitations is a question of law." ***Commonwealth v. Riding***, 68 A.3d 990, 993 (Pa. Super. 2013). Thus, "our standard of review is *de novo* and scope of review is plenary." ***Commonwealth v. Vega-Reyes***, 131 A.3d 61, 63 (Pa. Super. 2016). "Statutes of limitations are of course liberally construed in favor of

_____

[4] Appellant's fifth issue is moot as this Court eventually obtained the transcripts and is now addressing the merits of his appeal.

- 13 -

the defendant and against the Commonwealth." ***Commonwealth v. Cardonick***, 292 A.2d 402, 407 (Pa. 1972) (citations omitted).

Appellant's convictions for theft by deception and deceptive or fraudulent business practices are subject to a five-year statute of limitations. 42 Pa.C.S. § 5552(b)(1). In this case, prosecution was commenced on February 10, 2014, when a warrant was issued for Appellant's arrest. ***Commonwealth v. McSloy***, 751 A.2d 666, 668 (Pa. Super. 2000); 42 Pa.C.S. § 5552(e). Thus, barring any applicable exceptions, the statute of limitations will act to bar prosecution for any crimes committed before February 10, 2009. A crime has been committed when every element of the crime occurs, "or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the complicity of the defendant therein is terminated." 42 Pa.C.S. § 5552(d).

Relying on the continuing-course-of-conduct language in 42 Pa.C.S. § 5552(d), the trial court found that Appellant's actions were part of an ongoing course of conduct and that the statute of limitations had not run on any of the crimes for which Appellant was convicted. Trial Court Opinion, 5/22/17, at 18. Specifically, the court found that the evidence established that Appellant "engaged in Deceptive or Fraudulent Business Practices and Theft by Deception throughout 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013 and continued into 2014." ***Id***. at 19.

Appellant asserts that his crimes were intermittent, did not constitute a single, continuous act, and failed to show a repetitive pattern of behavior. Appellant's Brief at 14. Specifically, Appellant argues that the cases involved "different persons, in different locations, with different types of construction projects, and with different allegations of how the relationship with Appellant deteriorated." *Id*. at 15. We agree.

Preliminarily, we note that 42 Pa.C.S. § 5552(d) has been applied primarily to conspiracy cases. *Commonwealth v. Volk*, 444 A.2d 1182, 1187 (Pa. Super. 1982) (finding that conspiracy is a continuing offense and "any conspiracy that is renewed by repetitions may be prosecuted at any time within two years after the commission of the last offense"). Section 5552(d) has also been utilized for cases involving kidnapping as a continuing offense and receiving stolen property. *See Commonwealth v. Stewart*, 544 A.2d 1384, 1388 (Pa. Super. 1988) (applying Section 5552(d) to a case involving kidnapping and finding the conviction was not barred by the statute of limitations because the crime included not only the initial kidnapping, which had occurred outside the statute of limitations, but also included the continuing conduct of keeping the child outside of the custodian's dominion); *Commonwealth v. Farrar*, 413 A.2d 1094, 1098 (Pa. Super. 1979) (finding that receiving and retaining stolen property is a continuing offense for as long as the perpetrator retains the property for purposes of determining when the statute of limitations will run).

A review of relevant jurisprudence does not reveal any case law in which a court extended the statute of limitations as set forth in Section 5552(d) to an action for theft by deception or fraudulent business practices involving different victims over an extended period. *See Commonwealth v. Fisher*, 682 A.2d 811, 818 (Pa. Super. 1996) (finding that where defendant was convicted for theft by deception pursuant to a scheme where he advertised and sold plots of land to a number of victims, the five-year statute of limitations began to run on the date of the defendant's last deception for each victim of each individual count); *Kissinger v. Commonwealth*, 488 A.2d 401, 403–404, n. 8 (Pa. Cmwlth. 1985)[5] (finding that for purposes of 42 Pa.C.S. § 5552(d), Appellant's failure to connect to the township sewer system, despite two notices that he had 60 days to do so, over a year apart, was not a continuing crime and Appellant could be convicted twice for failing to comply with both notices).

We further note that we are unable to find a legislative purpose prohibiting a continuing course of conduct "plainly appears" in either 18 Pa.C.S. § 3922 (Theft by Deception) or 18 Pa.C.S. § 4107 (Deceptive or Fraudulent Business Practices). We are aware that pursuant to 18 Pa.C.S. § 3903(c)(3) and 18 Pa.C.S. § 4107(a.1)(2), the amount of money involved in the proscribed acts may be aggregated to determine the grade of offenses

---

[5] We note that we are not bound by the decision in *Kissinger v. Commonwealth*, 488 A.2d 401 (Pa. Cmwlth. 1985), but cite it as persuasive authority.

as long as the crimes are committed as part of one scheme or course of conduct. However, it is well established that statutes of limitation must be construed against the Commonwealth and in favor of the appellant. ***Cardonick***, 292 A.2d at 407. Given the above, we are unable to conclude that the required plain purpose is evidenced by a corollary statute allowing for aggregation of value for purposes of sentencing. Thus, we are constrained to agree with Appellant that the continuing-conduct language found in Section 5552(d) does not act to extend the statute of limitations in this case.

Section 5552(d) does not apply to extend the statute of limitations in this case, however, 42 Pa.C.S. § 5552(c)(1) allows prosecution for an otherwise time-barred offense for "[a]ny offense a material element of which is either fraud or a breach of a fiduciary obligation within one year after discovery of the offense by an aggrieved party. . . but in no case shall this paragraph extend the period of limitations otherwise applicable for more than three years." ***Id***.

Relying on Section 5552(c)(1), the trial court alternatively held that any crime which occurred in the eight years prior to the commencement of prosecution on February 10, 2014, was timely prosecuted. The trial court found that although the victims in this case may have been aware that Appellant was deficient in his performance as a contractor, his intent to deceive and defraud them was unknown until after the charges were filed

against Appellant on February 10, 2014. Trial Court Opinion, 5/22/17, at 22. Specifically, the trial court found that "[t]he victims did not have actual knowledge that a criminal offense had been committed until investigators were able to piece together a pattern of behavior sufficient to establish fraudulent intent as opposed to mere sloppy business practices." *Id*.

Thus, the trial court found that pursuant to 42 Pa.C.S. § 5552(c)(1), Appellant "was therefore timely prosecuted for any offenses occurring within eight years of the commission of the crime." *Id*. We agree. Pursuant to Section 5552(c)(1), discovery of the fraud "is not satisfied by mere suspicion, it requires acquisition of knowledge that a penal statute has been violated." *Commonwealth v. McSloy*, 751 A.2d 666, 669 (Pa. Super. 2000) (finding fraud was not known until coconspirator testified to the fraud before a grand jury). *See also*, *Commonwealth v. Hawkins*, 439 A.2d 748, 750 (Pa. Super. 1982) (finding that although there were events that could have indicated fraud prior to actual discovery, discovery of fraud required actual knowledge of the fraud).

In his brief to this Court, Appellant concedes that Section 5552(c)(1) is the exception the "legislature intended as the mechanism to toll the statute of limitations for a crime like Deceptive Business Practices." Appellant's Brief at 18. Appellant argues, however, that this rule does not apply because Appellant's victims were aware that Appellant failed to finish the work before their relationships with Appellant ended. *Id*. at 18. We reject

such a claim. The mere fact that Appellant failed to complete the contracted for work on the victims' homes did not equate with knowledge that Appellant had engaged in fraudulent and deceptive practices.

As discussed *supra*, Appellant's fraud was discovered on the day the warrant was issued for his arrest, February 10, 2014. Pursuant to 42 Pa.C.S. § 5552(c)(1), the statute of limitations for Appellant's crimes is extended for an additional three years; thus Appellant was timely prosecuted for any crime occurring after February 10, 2006.

We now turn to the individual victims and charged counts to determine whether the statute of limitations bars prosecution. Appellant asserts that offenses arising from his contacts with Mrs. Parker, Mr. Shulang, the Hahns, the Cienuches, Mr. Succi, Mr. Abramson and Mr. Spicer are all barred by the five-year statute of limitations because the crimes took place before February 10, 2009, which was five years from the day on which the warrant for Appellant's arrest was issued. Appellant's Brief at 12. However, as discussed above, pursuant to Section 5552(c)(1), the statute of limitations in this case extends back eight years, through February 10, 2006.

After a review of the facts in this case, we find that the Appellant's crimes against Mrs. Parker, Mr. Shulang, the Hahns, the Cienuches, Mr. Succi, Mr. Abramson and Mr. Spicer occurred or continued beyond February 10, 2006, and therefore, were timely prosecuted. Turning first to Mrs. Parker, Appellant and Mrs. Parker entered into a contract in June of

2005 and Appellant was on her property for approximately ninety days. N.T., 12/5/14, at 135. However, after he stopped working on her property, Appellant continued his fraudulent conduct by placing a mechanic's lien on Mrs. Parker's property. *Id*. at 147. Indeed, the suit relating to the mechanic's lien continued well into 2008, thus bringing it within the eight-year statute of limitations. *Id*.; Trial Exhibit C-8, Deposition of Appellant, 5/30/08. *See Commonwealth v. Fisher*, 682 A.2d 811, 818 (Pa. Super. 1996) ("Thus we conclude that the prosecution on each count must commence within five years of [appellant's] last deception relating to that count.").

Next, Mr. Shulang testified that Appellant began working on his property in August of 2005 and was terminated approximately on February 8, 2006. N.T., 12/5/14, at 97. Appellant, however, continued his deceptive and fraudulent practices by placing a mechanic's lien on Mr. Shulang's property in May of 2006, claiming that he was owed more money for various work he allegedly had done on Mr. Shulang's home, bringing Appellant's crimes against Mr. Shulang within the eight-year statute of limitations. *Id*. at 100. *See Fisher*, 682 A.2d at 818.

Appellant's convictions for his actions against the Hahns and the Cienuchs also occurred within the required statutory period. Mr. Hahn testified that he and Appellant entered into a contract for work on his home in August of 2006, within the eight-year statute of limitations. N.T.,

- 20 -

12/5/14, at 172–173. Similarly, Mrs. Cienuch testified at trial that she entered into a contract with Appellant on April 3, 2007, again within the required eight-year window. N.T., 12/8/14, at 7.

The convictions relating to Appellant's crimes against Mr. Succi, Mr. Abramson, and Mr. Spicer also occurred within the relevant statute of limitations. We note Mr. Succi hired Appellant to construct a second home on his property for his son in 2007, within the statute of limitations. N.T., 12/5/14, at 47. Appellant began working for Mr. Abramson in 2008 and the township issued a stop work order for Mr. Abramson's property on February 10, 2009, which falls within the time required by the statute of limitations. N.T., 12/8/14, at 49–50. We find Appellant was timely prosecuted for the crimes Mr. Abramson. As to Mr. Spicer, it is undisputed that Appellant continued to work for Mr. Spicer until May of 2009. N.T., 12/9/14, at 42. Thus, it is clear that Appellant's criminal conduct toward Mr. Spicer continued after February of 2006, and the statute of limitations does not bar prosecution and conviction for those crimes. Appellant was timely prosecuted for all offenses in the instant case.

In support of his second issue, Appellant argues that the Court of Common Pleas of Bucks County lacked jurisdiction over Appellant for the crimes committed in Philadelphia County or the State of New Jersey. Appellant's Brief at 5. This Court set forth the governing standards relating to jurisdiction in a criminal case:

> Subject matter jurisdiction speaks to the competency of a court to hear and adjudicate the type of controversy presented. Jurisdiction is purely a question of law; the appellate standard of review is *de novo* and the scope of review is plenary. Controversies stemming from violations of the Crimes Code are entrusted to the original jurisdiction of the courts of common pleas for resolution. All jurists within that tier of the unified judicial system are competent to hear and resolve a matter arising out of the Crimes Code.

*Commonwealth v. Elia*, 83 A.3d 254, 265 (Pa. Super. 2013) (citations omitted).

Appellant argues that jurisdiction was not proper for the convictions for theft by deception or fraudulent business practices that arose out of construction in Philadelphia County relating to Mr. Succi and New Jersey relating to Dr. Landes and Mr. Feinman. As to the New Jersey victims, Appellant concedes that the trial court had jurisdiction over the counts for theft by deception against both victims. Appellant's Brief at 23. He asserts, however, that the trial court did not have jurisdiction over the counts for deceptive or fraudulent business practices. *Id*. Appellant also argues that the trial court did not have jurisdiction over the crimes against Mr. Succi.[6]

Appellant's claim is without merit. Our Supreme Court has held unequivocally that "all courts of common pleas have statewide subject

---

[6] Appellant failed to raise the issue of alleged improper jurisdiction over the crimes against Mr. Succi in his 1925(b) Statement. Failure to raise an issue in a 1925(b) Statement results in waiver; jurisdiction, however, is not waivable and may be raised at any time, and *sua sponte*. *Commonwealth v. Little*, 314 A.2d 270, 272 (Pa. 1974) ("An objection to lack of subject-matter jurisdiction can never be waived; it may be raised at any stage in the proceedings by the parties or by a court on its own motion.").

- 22 -

matter jurisdiction in all cases arising under the Crimes Code." **See Commonwealth v. Bethea**, 828 A.2d 1066, 1074 (Pa. 2003). Subject matter jurisdiction references the court's power to adjudicate while venue addresses the convenience of the locality. **Id**. Although the terms are often used interchangeably, venue cannot exist without subject matter jurisdiction and they are distinct. **Id**. at 1075. "Rules of venue recognize the propriety of imposing geographic limitations on the exercise of jurisdiction. Venue in a criminal action properly belongs in the place where the crime occurred." **Id**. Indeed, although Appellant purports to argue jurisdiction was improper, his argument relates to the propriety of the venue, not jurisdiction.[7] The trial court properly exercised its jurisdiction in this matter.

In his third issue, Appellant contends that Bucks County was not the proper venue for the crimes committed in Philadelphia County against Mr. Succi or in the State of New Jersey against Dr. Landes and Mr. Feinman. Appellant's Brief at 5. In his omnibus pretrial motion, Appellant sought dismissal of the counts allegedly arising in Philadelphia alone. Omnibus Pretrial Motion, 11/25/14, at ¶¶ 5–9. Appellant did not seek dismissal of the New Jersey cases based upon improper venue before the trial court, thus, his argument is waived on appeal. **Commonwealth v. Yockey**, 158 A.3d

---

[7] Appellant relies on case law that was mired in the confusion relating to the interchangeability between venue and jurisdiction, which **Bethea**, 828 A.2d 1066, addressed.

1246, 1259 (Pa. Super. 2017) ("issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Moreover, Appellant filed a motion to dismiss for lack of proper venue; however, dismissal is not the proper remedy for an allegedly improper of venue. ***Commonwealth v. Gross***, 101 A.3d 28, 36 (Pa. 2014) ("[N]o provision in our criminal procedure rules permits dismissal as a remedy for improper venue"). Instead of dismissal, "our rules repeatedly speak to transferring cases to another judicial district when improper venue is determined." ***Id***. "As venue is predominantly a procedural matter, and pertains to the locality most convenient to the proper disposition of a matter, dismissal is inappropriate and unjust where a court merely finds another judicial district provides a more appropriate forum." ***Id***. (citations omitted). Indeed, "the purpose of venue, apart from the manner in which it relates to subject matter jurisdiction, is a matter of convenience to the litigants." ***Commonwealth v. Miskovitch***, 64 A.3d 672, 689 (Pa. Super. 2013). Further, as in this case, where jurisdiction is proper, venue is primarily a matter of procedure, and Appellant is required to show he was prejudiced because the trial was held in Bucks County rather than another location. ***Id***. ("Thus even assuming venue was improper, Appellant must demonstrate prejudice in order to be entitled to relief at least . . . where the choice of venue is purely procedural and not jurisdictional in nature.). Appellant has failed to make the necessary showing of prejudice. Appellant's

claim that the trial court erred when it denied his motion to dismiss for lack of venue is without merit.

In support of his fourth issue, Appellant asserts that the trial court imposed an illegal and unconstitutional sentence when it sentenced him "with the intent to impose a life sentence." Appellant's Brief at 5. Preliminarily, we note that Appellant failed to raise a challenge to the constitutionality of his sentence in his Pa.R.A.P. 1925(b) statement.[8] It is well established that an issue not raised in a 1925(b) statement is waived for purposes of appeal. Pa.R.A.P. 1925(b)(4)(vii). Appellant asserts, with no significant analysis, that his claim of an Eighth Amendment violation constitutes a challenge to the legality of his sentence and that challenge cannot be waived. Appellant's Brief at 25. Indeed, although a challenge to the discretionary aspects of sentencing is subject to waiver, the legality of a sentence cannot be waived. *Commonwealth v. Schutzues*, 54 A.3d 86, 91 (Pa. Super. 2012). Appellant argues that his sentence is illegal because it is an unconstitutional violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Appellant's Brief at 25–27. Whether Appellant's challenge implicates the legality of his sentence presents a pure question of law. *Commonwealth v. Foster*, 17 A.3d 332, 340 n. 13 (Pa. 2011). Our standard of review is *de novo* and our scope of review is plenary. *Id*.

---

[8] Appellant also failed to file a post-sentence motion as required by Pa.R.Crim.P. 720 or a Pa.R.A.P. 2119 statement with this Court.

Contrary to Appellant's claim that an alleged Eighth Amendment violation constitutes a challenge to the legality of the sentence, there is no bright line rule establishing whether a challenge to a sentence, constitutional or otherwise, implicates the legal or discretionary aspects of that sentence. *See Commonwealth v. Spruill*, 80 A.3d 453, 460–461 (Pa. 2013) (noting the Supreme Court's "experience with claims allegedly implicating sentence legality has not always been smooth" and noting the complexities involved in the issue). However, this Court has stated that "the term 'illegal sentence' is a term of art that our courts apply narrowly, to a relatively small class of cases." *Commonwealth v. Robinson*, 931 A.2d 15, 21 (Pa. Super. 2007).

"Legality of sentence issues occur generally either: (1) when a trial court's traditional authority to use discretion in the act of sentencing is somehow affected and/or (2) when the sentence imposed is patently inconsistent with the sentencing parameter set forth by the General Assembly." *Schutzues*, 54 A.3d at 92 (quoting *Commonwealth v. Foster*, 17 A.3d 332, 342 (Pa. 2011)). Most other challenges implicate the discretionary aspects of a sentence, "even though the claim may involve a legal question, a patently obvious mathematical error, or an issue of constitutional dimension." *Robinson*, 931 A.2d at 21 (finding that a claim of vindictiveness by the trial court when sentencing a defendant does not implicate the legality of the sentence). Indeed, where, as here, an appellant argues that the sentencing court exercised its discretion in a way

that was harsh, unreasonable, or motivated by impermissible factors such as personal animus or revenge, those contentions "are the very hallmarks of a claim that implicates the discretionary aspects of a sentence." *Id*.

In this case, Appellant argues that his sentence is excessive in that the trial court "expressed an intent to impose a sentence that would keep Appellant incarcerated for the remainder of his natural life," as evidenced by a statement the trial court made during Appellant's sentencing. Appellant's Brief at 27. This assertion of bad intent on the part of the trial court does not implicate the legality of Appellant's sentence. *Robinson*, 931 A.2d at 21. Instead, it is a challenge to the discretionary aspect of his sentence, a challenge which Appellant has waived due to his failure to include the issue in his 1925(b) Statement and post-sentencing motion.

Even assuming, *arguendo*, that Appellant did not waive his Eighth Amendment's argument, he would not be due any relief. "The Eighth Amendment does not require strict proportionality between the crime committed and the sentence imposed; rather, it forbids only extreme sentences that are grossly disproportionate to the crime." *Commonwealth v. Baker*, 78 A.3d 1044, 1047 (Pa. 2013). In order to determine if a sentence runs afoul of the Eighth Amendment, this Court will apply a three-pronged test:

> [A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the

sentences imposed for commission of the same crime in other jurisdictions.

*Id*. (quoting **Commonwealth v. Spells**, 612 A.2d 458, 462 (Pa. Super. 1992) (*en banc*)). Although there are three prongs to the test, this Court "is not obligated to reach the second and third prongs of the **Spells** test unless a threshold comparison of the crime committed and the sentence imposed leads to an interference of gross disproportionality." **Baker**, 78 A.3d at 1047.

Appellant does not, and indeed, could not, argue that the trial court's sentence exceeded any statutory maximum; rather he posits that his sentence is "grossly disproportionate to his non-violent offenses," particularly where he "had no prior criminal history and had a prior record score of zero." Appellant's Brief at 27. In the instant case, the sentence imposed by the trial court was within the sentencing guidelines, save the sentence imposed for insurance fraud,[9] and none of the sentences exceeded any statutory maximums. The trial court found no mitigating factors in this case and noted Appellant has failed to show any remorse for his crimes. N.T., 1/16/15, at 61, 66.

Moreover, the fact that Appellant was a first-time offender and his crimes were of a non-violent nature does not minimize the seriousness of the offenses, the amount of money at issue, or the impact on his victims.

___

[9] The trial court explained that it was exceeding the guidelines and sentencing Appellant to the statutory maximum because he fraudulently used the insurance company's good name, and lead his victims to believe they would be made whole if there were any problems, when he knew that was not the case. N.T., 1/16/15, at 72–73.

Indeed, Appellant defrauded his victims out of hundreds of thousands of dollars. In addition, Appellant threatened and intimidated his victims if they sought any sort of remedy, legal or otherwise. Appellant used the legal system to continue to defraud his victims by placing mechanic's liens on several victims' homes and suing another for libel. He declared bankruptcy in order to render himself essentially judgment proof. Appellant's actions have financially devastated multiple victims. Further, as the trial court noted, "It is very clear based on [Appellant's] bankruptcy, his removal and dissipation of assets, that restitution is not a real possibility to these people." N.T. 1/16/15, at 74.

Given the facts of this case, and the manner in which Appellant defrauded and exploited his victims, we find Appellant cannot satisfy the first prong of the proportionality test; thus, we need not analyze further. Appellant has failed to show that his sentence is illegal and violative of the Eighth Amendment. Appellant's argument lacks merit, and he is entitled to no relief on that ground.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/12/2017

- 29 -