J-S09028-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN SUCCI | : | |
| | : | |
| Appellant | : | No. 1935 EDA 2020 |

Appeal from the PCRA Order Entered April 14, 2020
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0005704-2014

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN SUCCI | : | |
| | : | |
| Appellant | : | No. 1936 EDA 2020 |

Appeal from the PCRA Order Entered April 14, 2020
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0002732-2014

BEFORE:  OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY McCAFFERY, J.:            **FILED:  JUNE 4, 2021**

John Succi (Appellant) appeals from an order entered in Bucks County Court of Common Pleas dismissing his petition brought under the Post Conviction Relief Act (PCRA).[1]  We affirm.

---

[1] 42 Pa.C.S. §§ 9541-9546.

Quoting the trial court, a prior panel of this Court summarized the underlying facts as follows:

The testimony elicited over the lengthy trial established that [Appellant] owned and operated a construction company located in Yardley, Bucks County. Deborah Parker resided in a single family home located in Doylestown, Bucks County. In June of 2005, Mrs. Parker entered into a home improvement contract with [Appellant]. Pursuant to that contract and an addendum to the contract, [Appellant] agreed to make a number of internal and external improvements to Mrs. Parker's home. The project was to be completed in four weeks. Three months after construction began, the project had still not been completed. Due to [Appellant's] poor work, his routine absences from the project and his repeated demands for money in advance, Mrs. Parker contacted other contractors who, after inspecting the property, advised her that the work [Appellant] had done was so inferior, it would have to be completely redone. [Appellant] ultimately abandoned the project leaving asbestos and other debris littered around the property. When he stopped work, major portions of the work were incomplete and the work that had been completed was substandard. After abandoning the project, [Appellant] placed a mechanic's lien on Mrs. Parker's property. At the time of trial in December of 2014, much of the original project had still not been completed and the remaining defective work had still not been repaired.

In August of 2005, about the same time [Appellant] abandoned Mrs. Parker's project, [Appellant] contracted with Richard Schulang to perform construction work on Mr. Schulang's home in Jamison, Bucks County. Under the terms of the contract, [Appellant] agreed to finish the basement of the home which was to include framing, insulation, electric, installation of a drop ceiling, construction of a cover for a radon pipe with an access panel and construction of a mechanical closet for $28,500. He also agreed to enlarge an existing deck on the home and replace the old decking with composite wood for $6,500. This project was supposed to be completed within three weeks.

By February of 2006, after numerous delays in construction, [Appellant] stopped work. At the time he abandoned the project, much of the work had not been completed although he had

- 2 -

received all but $1,250 of the contract price. In addition, much of the work that had been completed was substandard. The deck [Appellant] built could not pass inspection and was torn down. The composite wood decking used was improperly installed, voiding its warranty. In the basement, the electrical work did not pass inspection. Many of the outlet holes were too large and needed to be fixed. In addition, various materials Mr. Schulang had paid for were not delivered, including ground fault interrupters, door handles, deck railings and tile. A permit Mr. Schulang had paid for was never obtained. In May of 2006, [Appellant] placed a mechanic's lien on Mr. Schulang's property.

In August of 2006, a few months after [Appellant] stopped working on the Schulang project, [Appellant] contracted with Brian Hahn to add a basement to Mr. Hahn's home in Lower Makefield Township, Bucks County. Construction of the basement entailed removal of the back deck, lifting the structure, excavating the basement, laying a new foundation and lowering the structure onto the new foundation. [Appellant] agreed to perform the work for $45,000.

Although Mr. Hahn had paid [Appellant] a total of $52,600, an amount in excess of the original contract, [Appellant's] work was seriously deficient. [Appellant] initially failed to obtain the necessary permits and work was sporadic. The work site was scattered with debris. The foundation was inadequate and in danger of collapse. Because the house was not set on the foundation properly, the windows in the home would not open, tiles popped, walls cracked, kitchen cabinets pulled away from the walls and the floor sloped.

During a discussion of [Appellant's] demand for more money and his failure to obtain the necessary inspections, Mr. Hahn asked if he needed to "protect" himself. [Appellant] responded, "If you go legal on me, I'll bury you. I'll bury you financially." Mr. Hahn thereafter contacted an attorney and removed [Appellant] from the project. Eventually, Mr. Hahn was forced to expend over $160,000 to obtain the necessary permits and inspections and to bring the project into conformity with the original architectural plans and engineering specifications.

On April 3, 2007, [Appellant] entered into an agreement with Monica Cienuch and her husband, Adam, to rebuild the kitchen in their home in Levittown, Bucks County. The agreement

- 3 -

called for [Appellant] to remove the existing sunroom, lay a foundation, erect the framing for the kitchen and install basic electric and plumbing. In May of 2007, [Appellant] and the [Cienuches] agreed that [Appellant] would also finish the interior of the kitchen. The entire project was to cost $36,000.

On May 16, 2007, [Appellant] notified Mrs. Cienuch that the construction permits had been approved. On May 21, 2007, demolition began. On May 24, 2007, Mrs. Cienuch was advised that, although an application had been made, the permits had not yet been obtained. Mrs. Cienuch took matters in her own hands and was able to obtain the necessary permits on June 1, 2007.

Thereafter work proceeded sporadically and the [Cienuches] soon began to observe problems. With regard to the foundation, [Appellant] failed to deliver the foundation material that had been agreed upon, using demolition debris instead of high-quality stone. The foundation laid by [Appellant] did not pass inspection. There were also significant problems with the framing. Although they had notified [Appellant] of the defective framing and [Appellant] had assured them problems with the framing would be corrected, the issues with regard to the framing remained unaddressed. Despite having received $30,500 of the total contract price of $36,000, [Appellant] had only completed the foundation, framing and basic plumbing. The cabinets and countertops that Mr. and Mrs. Cienuch had paid $7,000 in advance to [Appellant] were never ordered or delivered.

As a result of the issues regarding delays, materials and inferior workmanship, the [Cienuches] retained an attorney, terminated the contract and demanded a refund of $20,000. In response, [Appellant] stated that the [Cienuches] were "welcome to go to court," adding that he was going to "lock [them] in the litigation for years." The [Cienuches] thereafter retained a new contractor to repair and complete the project. The additional cost for labor alone was $24,800.

In September of 2007, [Appellant] entered into an agreement with Anthony Succi and his parents to build a special needs home for Mr. Succi's son on the parents' property in Philadelphia for $210,000. During the project, the price increased based on [Appellant's] representations that additional money was needed to address unexpected problems. Mr. Succi paid [Appellant] over $263,900. The project was thereafter shut down

by the Philadelphia Department of Licenses and Inspection for non-compliance and lack of permits.

Mr. Succi described the status of the project at the time [Appellant] was shut down as "a shell." He further stated,

> [Appellant] had constructed a foundation of concrete that was out of level. It had a 7–foot basement that leaked at least a foot of water at a minimum. It had a roof that was put on that leaked profusely. It had windows partially put in. And the whole outside was just pure plywood that started rotting because of the weather and inside had two by four's.

The Philadelphia Department of Licenses and Inspections required Mr. Succi to demolish the house for health and safety reasons. Demolition cost Mr. Succi an additional $15,000.

On June 4, 2008, [Appellant] contracted with Stuart Abramson to build an addition to Mr. Abramson's residence in Buckingham Township, Bucks County. [Appellant] agreed to add a room, enlarge the garage and another area of the house, construct a patio and install stucco. The total cost of the project was $142,000. [Appellant] also agreed to a specific payment schedule that was tied to the completion of specific items of work. However, after construction commenced, [Appellant] frequently requested money ahead of the payment schedule, claiming that, without the money, he could not order materials. By January of 2009, Mr. Abramson had paid [Appellant] $120,000. Mr. Abramson had paid for but did not receive drywall, electric, the shingle roof, windows, stucco, heating and air conditioning, a fireplace, hardwood flooring and tile work.

In January of 2009, the Township inspected the project and issued a stop work order. Much of the work [Appellant] had done needed to be removed due to code violations. Mr. Abramson explained the resultant condition of the addition as follows:

> Now I was left with a bare frame. There was nothing inside. No drywall, minimal insulation, concrete floors that were poured incorrectly. They made me bring in a carpenter and take down support structures from all the ceilings, because they weren't to code.

- 5 -

Mr. Abramson paid other contractors $70,000 to complete the projects. [Appellant] did not reimburse Mr. Abramson for any of the work not performed or materials not delivered.

In September of 2008, while Mr. Abramson's project was still underway, [Appellant] entered into a preliminary contract with Andrew Spicer to build an addition to his home in Pipersville, Bucks County. Once architectural plans were completed, a final contract was executed in October of 2008. Under the terms of the final contract, the total cost of the project was $97,000. Work was to be completed in about six months. Pursuant to the final contract, Mr. Spicer paid [Appellant] $21,550 in deposits for materials and [Appellant] began construction. By Thanksgiving, [Appellant] had dug a hole for a foundation. By the end of November, early December of 2008, work on the foundation had begun but had not been completed. Thereafter, all work stopped until March of 2009.

In a separate agreement, entered into at the end of 2008 or the beginning of 2009, [Appellant] agreed to tile the kitchen floor that was adjacent to the planned addition for a price of $4,500 or $5,000. [Appellant] was paid and work commenced.

In March of 2009, [Appellant] resumed work on the addition. At that time the foundation was poured and framing was completed. At this stage of the project, [Appellant] began to demand payments ahead of the payment schedule. While Mr. Spicer made at least one payment ahead of schedule, he began to refuse to pay for work until that work was in fact completed in accordance with the contract.

In May of 2009, the project was terminated by agreement. By that time, Mr. Spicer had paid [Appellant] $67,000 for work that was incomplete, defective or not in built with the specified material. Specifically, the architectural plans called for large wooden beams, called "LVL" beams, to be used in the framing. Although those beams were initially installed by [Appellant], he later replaced them with scrap wood. Numerous tiles installed by [Appellant] in the kitchen of Mr. Spicer's home thereafter "popped" while others cracked. Pieces of the old porcelain tile floor were dumped in the backyard. [Appellant's] substandard work caused the ceiling of Mr. Spicer's home to crack and the porches to sink. The Spicers were unable to correct all of the problems without demolishing the work and starting over. The

Spicers spent approximately $85,000 to finish the project "as best [they] could."

In September of 2009, [Appellant] agreed to build an addition onto the home of Jeffery and Anette Goldstein in Richboro, Bucks County, for the use of Mrs. Goldstein's mother, Erica Baratz, for $80,000. [Appellant] agreed to demolish an existing garage and bathroom and to construct a complete residential structure with a brick patio.

During construction, [Appellant] left a wall to the home open to the outside, with only a tarp covering certain areas. Other problems also arose. The project failed multiple inspections, damage was caused to original property and [Appellant] began to significantly deviate from the construction plans. Although work initially began in a timely manner, the project soon became months behind schedule and [Appellant] began to continuously demand[ ] money from Mrs. Baratz. When Mrs. Baratz exhausted her funds, [Appellant] told her to charge the work to her credit cards. Ultimately, [Appellant] received approximately $120,000 from the Goldsteins and Mrs. Baratz. When Mr. Goldstein voiced complaints, [Appellant] warned him that he had "political power" and threatened to make Mr. Goldstein's life "miserable."

In July or August of 2010, [Appellant] walked off the job. At that time, [Appellant] had completed only eighty percent of the work outlined in the contract and had failed to order or deliver items that had been paid for in advance, including $5,000 worth of cabinets and two fireplaces. [Appellant] did not finish constructing the walls, used regular concrete instead of brick on the patio and had installed inferior air conditioning and heating units. The Goldsteins and Mrs. Baratz were financially unable to complete the project. They received estimates that the heating and air conditioning alone would cost $15,000 to $20,000, an amount they could not afford. They did expend an additional $5,000 to complete the necessary electrical and plumbing work and for a fireplace.

In January of 2010, [Appellant] agreed to build a home in Margate, New Jersey for Larry Feinman, a resident of Holland, Bucks County. Initially, due to their personal relationship, [Appellant] and Mr. Feinman proceeded without a formal contract. Mr. Feinman gave [Appellant] blueprints for construction of a three-story home and [Appellant] agreed to build the home for

$425,000. The price was later raised to $470,000. After the project ran behind schedule, Mr. Feinman insisted [on] executing a formal agreement. That agreement was entered into in June or July of 2010 and set forth an agreed price of $470,000.

By the end of 2010, Mr. Feinman had paid [Appellant] more than the contract price. Despite that fact, [Appellant], who had "been off the job for a while," appeared to have abandoned the project, leaving a substantial amount of the project incomplete. [Appellant] never built permanent stairways to the upper floors and had not installed any of the plumbing fixtures. [Appellant] never delivered materials and appliances Mr. Feinman had paid for, including air conditioner compressors, kitchen appliances, kitchen cabinets, tile, insulation and drywall. The total cost of these items was at least $19,000. Although [Appellant] did install a water heater, he did not install a "tankless" water heater system as specified in the contract. As a result of all of these deficiencies, Mr. Feinman was forced to expend more than $300,000 to complete the home.

On May 20, 2010 after a few months of negotiation, [Appellant] contracted with Dr. Sherri Landes, a resident of Ivyland, Bucks County, to build a home on her property in Margate, New Jersey. [Appellant] agreed to construct the home in accordance with the architectural plans for $395,300. Although Dr. Landes initially intended to finance the construction with a construction loan, [Appellant] persuaded her to borrow on her existing home equity line of credit. A construction loan would have required bank inspections to determine that the work had been properly completed before funds were released to pay for that work. Initially, Dr. Landes followed the practice that would have been in place if she had obtained a construction loan, i.e. inspection of the work to determine if the work had been properly completed before funds were released to pay for that work. However, [Appellant] eventually began to ask for money in advance of the payment schedule for materials. Dr. Landes obtained a second home equity line of credit for $500,000 to keep the project moving.

Dr. Landes paid [Appellant] in advance for many of the materials to be used in the project, i.e., $30,000 for windows, $5,500 for plumbing fixtures, $15,000 for tile, $1,400 for granite countertops, $6,500 for railings and $19,375 for external concrete pillars. [Appellant] never purchased these items. Dr. Landes

ultimately had to purchase these items directly from the suppliers to complete the project. Dr. Landes paid [Appellant] and his suppliers a total of $604,465.17 on a home she had contracted to have built for $395,300.

In March of 2011, [Appellant] asked for an additional $55,500 to complete the job. At the end of March, Dr. Landes asked [Appellant] to provide an accounting of project expenditures. [Appellant] provided her with a list of expenditures that included payments for [Appellant]'s personal expenses, payments to suppliers that had not been made, payments for labor and materials for work that had not been done, and other unauthorized expenditures. Many line items were left blank. No receipts were provided.

Work ceased in April of 2011. Dr. Landes described the condition of the property at that time as follows:

> It contained a tile roof with no underlayment, meaning no flashing, nothing to prevent it from leaking. The tiles that were on there were not the tiles that he showed me initially. They ended up to be Northern roof tiles which I paid for, again, as I mentioned. And they all had to be removed. And I had to pay an extra [$] 25,000 for the roof to be fixed so that it wouldn't leak. There was a thin coat of stucco on the outside that was placed before the windows were put in. I questioned that but, you know, [Appellant] said, "You are not a builder. You don't know anything." But I had built a house before and I knew stucco shouldn't be placed before windows. So that had to be removed. It was a thin coat that would have leaked. And there were no flashings. So ultimately I had to pay another—I have the figures. I think it was another 17,500 or maybe even more for stucco to properly be constructed.
>
> Q. Had you already paid [Appellant] for that stucco?
>
> A. Yes. I paid for everything on the contract. And so in addition to the roof and the framing, there was nothing inside of the house. There were no walls, there was no plumbing, there was no interior, nothing. The only thing that was, there was a decorative

marble fireplace surround that I had purchased. [Appellant] called me one day and said, "We are ready for your fireplace surround," so I thought that walls were up. I thought the drywall was up and interior was finished. And when I drive down from Pennsylvania to New Jersey to actually see the house, I saw the fireplace surround, but no walls. And when the house was finally built, it had to be retrofitted because it was just a decorative thing put up with no walls. There was really nothing else there. There were balconies and they had to be resurfaced and redone because they weren't constructed properly. And nothing else that I had paid for was present.

* * *

The exterior concrete finishes were not done which included a driveway, sidewalk and that kind of thing. HVAC installations, not done; electrical work, not done; plumbing installations, not done; drywall interior finishes, not done; all interior and exterior trim finished, decks and rails only half done. Because I did have decking, but I had no windows and I had no interior, obviously. So this includes interior trim, doors, windows, railings, base board column, hardwood flooring, not done; marble tile flooring in bathrooms not done; marble tile, all the interior work, nothing done; all walls and ceilings painted, not done; kitchen fixtures, not done.

Dr. Landes paid an additional $400,000 to finish building the house, spending in total, one million dollars to build a $400,000 home. [Appellant] never reimbursed Dr. Landes for work not performed or for materials not delivered. Instead, he filed a mechanic's lien against her property for $150,000. When a potential customer, Phil Karali, called Dr. Landes to inquire about [Appellant's] job performance, she told him that she paid [Appellant] $604,000 for a home and got a shell, a roof and a framed structure. [Appellant] sued her for defamation of character and tortious interference with a contract.

In November of 2011, [Appellant] contracted with Cindy and Dale Ross to remodel the first floor of their residence in Levittown, Bucks County. [Appellant] agreed to completely gut the first floor,

- 10 -

rebuild the bathroom and kitchen and install drywall and new heater for $94,500. [Appellant] told the Rosses that they would have to move out of their residence by January 9, 2012 but that they would be able to return on March 8, 2012. In May of that year, a cease work order was issued by the local authorities due to the fact that [Appellant] had not obtained the proper permits. When the project was shut down, the Rosses terminated their contract.

Although the Rosses had paid [Appellant] $86,583 of the $94,500 contract price, [Appellant] had completed only 25 to 35 percent of the work specified in the agreement. Mrs. Ross testified that she was left with "a gutted empty house, no walls, no plumbing, no electric." The Rosses never receive[d] all of the materials they had paid for in advance, including granite counter tops and insulation. [Appellant] never reimbursed Mrs. Ross for work not finished or materials not delivered. He told Mrs. Ross that he would complete the project if she paid him an additional $35,000. In order to enjoy the use of their home, the Rosses were forced to pay another contractor $200,000 to correct and complete the renovation.

In October of 2013, [Appellant] contracted with George Monti to rebuild a roof on a commercial property located in Tullytown, Bucks County for $28,875. This contract was later increased by $6,575 at [Appellant's] suggestion to add plywood to the "decking." After Mr. Monti agreed to the addendum, [Appellant] began to regularly request more money in advance for materials. The project, which [Appellant] represented could be completed in a few days, was still not completed as of April of the following year. In the interim, extensive water damage was caused to the interior of the building by "leaks" in the incomplete roof. Mr. Monti hired another roofer to complete the project for $50,000. In addition, Mr. Monti suffered a substantial financial loss due to the damage to his real and personal property caused by water damage.

In August of 2013, shortly before [Appellant] contracted with Mr. Monti to rebuild his roof, [Appellant] obtained a commercial insurance policy from Erie Insurance. Timothy Pantano, a salesman and customer service representative for Erie Insurance, sold the policy to [Appellant]. During the application process, [Appellant] made several misrepresentations. He told Mr. Pantano that he had not filed for bankruptcy in the past five

- 11 -

years, that he did not subcontract any work and that he did not accept jobs that only involved new roofing or reroofing. [Appellant] later signed the application, certifying that the information he had given was true and complete.

*Commonwealth v. Succi*, 173 A.3d 269, 272–78 (Pa. Super. 2017), *quoting* Trial Ct. Op., 5/22/17, at 2-16 (footnotes omitted).

Appellant's jury found him guilty of two counts of home improvement fraud, twelve counts of deceptive or fraudulent business practices, twelve counts of theft by deception, and one count of insurance fraud.[2] The trial court initially sentenced him to fourteen to twenty-eight years of imprisonment, but adjusted its sentence to an aggregate term of fifteen to thirty years of imprisonment. The trial court ultimately concluded that Appellant's behavior, over the course of nine years, caused financial losses to his victims totaling $1,637,152.98. Trial Ct. Op. at 1.

This Court affirmed Appellant's judgment of sentence on October 12, 2017. Appellant sought reargument, which was denied on December 12, 2017. On July 3, 2018, our Supreme Court denied Appellant's petition for allowance of appeal.[3]

Appellant filed a timely initial PCRA petition on July 2, 2019. The trial court eschewed a hearing, issuing its notice pursuant to Pa.R.Crim.P. 907 on December 20, 2019. The trial court dismissed the petition on April 14, 2020. However, Appellant subsequently filed two other petitions (one per each

_____

[2] 73 P.S. § 517.8(a)(2); 18 Pa.C.S. §§ 4107(a)(2), 3922(a)(1), 4117(b)(4).

[3] *See Commonwealth v. Succi*, 17 MAL 2018 (Pa. Jul. 3, 2018).

captioned docket), in which he claimed he was not served and had no notice of the trial court's intention to dismiss and actual dismissal of his petition. On October 8, 2020, Appellant's appeal rights were reinstated *nunc pro tunc* to appeal from his PCRA dismissal, and on October 14, he filed a timely notice of appeal.[4]

In the present appeal, Appellant presses the following claims:

I.      Did [Appellant's] trial counsel provide ineffective assistance of counsel for not filing a Motion for Reconsideration of Sentence pertaining to the discretionary aspects of sentencing, and for not including in his [Pa.R.A.P. 1925(b) Statement] any issues pertaining to the discretionary aspects of sentencing?

II.      Did [Appellant's] trial counsel provide ineffective assistance of counsel for not properly filing and arguing a motion to dismiss and/or transfer venue [regarding] the Philadelphia and New Jersey cases?

Appellant's Brief at 4.

We review PCRA court determinations to ensure that they are supported by the record and free from legal error. ***Commonwealth v. Marshall***, 947 A.2d 714, 719 (Pa. 2008). The PCRA provides redress where a conviction or

_____

[4] On December 22, 2020, this Court issued a Rule to Show Cause, as the notice of appeal as filed in both captioned matters did not identify the date of entry of the subject order of the appeal. On December 28th, Appellant filed a response, explaining that a breakdown in courtroom operations (lack of receipt of the Pa.R.Crim.P. 907 Notice and Order of Dismissal) prompted the lapse of the appellate period, necessitating *nunc pro tunc* reinstatement. The PCRA court notes in its opinion that it reinstated appellate rights with the Commonwealth's agreement. PCRA Ct. Op. at 3. We will not disturb the PCRA court's resolution of this issue, and in the interest of judicial economy will overlook that Appellant's notice of appeal did not specify (as it should have; ***see*** Pa.R.A.P. 904) the date of the order or orders from which arises the present consolidated appeal.

sentence results from the ineffective assistance of counsel. 42 Pa.C.S. § 9543(a)(2)(ii). To prevail on such a claim, a petitioner must establish by a preponderance of the evidence that "the underlying claim is of arguable merit, counsel's performance lacked a reasonable basis, and counsel's ineffectiveness caused him prejudice." *Commonwealth v. Solano*, 129 A.3d 1156, 1162 (Pa. 2015).

Appellant argues that trial counsel was ineffective for failing to preserve a claim as to the discretionary aspects of the sentence imposed for direct review. Appellant's Brief at 11-14. Because the individual sentences (which were mostly within the standard range) were structured to run consecutive to one another, Appellant argues, the aggregate sentence is unduly harsh and clearly unreasonable. *Id.* at 12-13. He sees this as an instance of "non-violent property crimes" and asserts that an aggregate sentence of one and one-half to three years would have been merited, given his age, health, and other characteristics. *Id.* at 13. Though Appellant attempted to raise the issue on direct appeal, this Court found it to be waived. *See Succi*, 173 A.3d at 285 (Appellant's argument amounts to "a challenge to the discretionary aspect of his sentence, a challenge which Appellant has waived due to his failure to include the issue in his 1925(b) Statement and post-sentencing motion.").

During Appellant's sentencing hearing, the trial court stated that it "did not expect [Appellant] to be out of the State Penitentiary in such a condition that you would ever be in a position to defraud any person in this county or

in any other state in this country as far as that was [the court's] intent." N.T. Sent., 1/16/15, at 75. On direct appeal, Appellant characterized this as "express[ing] an intent to impose a sentence that would keep Appellant incarcerated for the remainder of his natural life" and therefore inappropriate. *See Succi*, 173 A.3d at 285 (quoting Appellant's direct appeal brief).

The Commonwealth argues that Appellant has not established the existence of a substantial question, and therefore cannot show that the underlying claim is meritorious. Commonwealth's Brief at 30-32. The Commonwealth points out that, although Appellant cites ***Commonwealth v. Dodge***, 957 A.2d 1198 (Pa. Super. 2008), in support of his argument,[5] ***Dodge*** is "plainly inapposite" and "Appellant's sentence was drastically **less** significant than the aggregate consecutive sentences imposed in ***Dodge***, and his conduct was substantially **more** egregious." Commonwealth's Brief at 31, 32.

"Sentencing is within the sound discretion of the sentencing judge, and his or her decision will not be disturbed absent a manifest abuse of discretion." ***Commonwealth v. Hoag***, 665 A.2d 1212, 1213–14 (Pa. Super. 1995) (citation omitted). "The general rule in Pennsylvania is that in imposing a sentence the court has discretion to determine whether to make it concurrent with or consecutive to other sentences then being imposed or other sentences

---

[5] *See* Appellant's Brief at 13.

previously imposed." ***Commonwealth v. Graham***, 661 A.2d 1367, 1373 (Pa. 1995) (citation omitted).

We are not at all persuaded by Appellant's attempts to downplay the damage his conduct caused by describing his convictions as "non-violent property crimes" and yet to describe a fifteen-year minimum as an "effective life sentence." Our courts have viewed with suspicion the "volume discount" theory of sentencing. ***See, e.g., Hoag***, 665 A.2d at 1214.

The trial court may have used the phrase "effective life sentence" but it is plain from context that the trial court referred merely to Appellant's **economic life**, that is, his employable years, rather than the potential full span of his natural life. The trial court actually said "I do not expect you to be out of the State Penitentiary in such a condition that you would ever be in a position to defraud any person in this county or in any other state in this country as far as that was my intent." N.T. Sent., 1/16/15, at 75. Further, we find nothing inappropriate in the consecutive nature of several otherwise-unremarkable guidelines sentences. As this Court is often called upon to reiterate, there is no entitlement to a volume discount, no matter how unblemished the defendant's prior record and how prolific the charges that arose from the defendant's apparent departure from that record. Rather than saying that this was Appellant's first offense, it is more accurate to say that this was Appellant's first nine years of charged offenses, in which he inflicted $1,637,152.98 of financial damage and incalculable emotional damage on his victims. ***See*** Trial Ct. Op. at 1.

Appellant also argues that trial/appellate counsel was ineffective for failing to litigate a successful venue challenge and potential motion to dismiss regarding Appellant's convictions for misdeeds in Philadelphia and New Jersey, as his trial took place in Bucks County. Appellant's Brief at 14-19.[6]

The Commonwealth argues that the claim is previously litigated, and that Appellant has not surmounted the threshold inquiry into whether the underlying claim has arguable merit. Commonwealth's Brief at 19-25. If we discover the claim to be previously litigated, we may proceed no further, as such claims will not merit relief under the PCRA. *See* 42 Pa.C.S. § 9543(a)(3). Upon review of this Court's opinion on direct appeal, we arrive at the following: "Appellant has failed to make the necessary showing of prejudice. Appellant's claim that the trial court erred when it denied his motion to dismiss for lack of venue is without merit." *Commonwealth v. Succi*, 173 A.3d 269, 284 (Pa. Super. 2017). Because this Court has already determined that the underlying claim lacks merit, we may not revisit that determination and we may not grant relief based on this issue, its merits having been previously litigated.

Order affirmed.

---

[6] Appellant argues that the trial court relied on victim testimony regarding out-of-jurisdiction witness testimony at sentencing, and therefore "the Commonwealth cannot establish beyond a reasonable doubt the error was harmless in this respect." Appellant's Brief at 19. We remind Appellant that he carries the burden of establishing each element of his ineffectiveness claim. Though the Commonwealth may have carried such a burden at trial, this is Appellant's petition. "The burden of proving ineffectiveness of counsel is on the party alleging it, and that burden does not shift." *Commonwealth v. Cross*, 634 A.2d 173, 175 (Pa. 1993) (citation omitted).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/4/21